**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

---

In re:

Kidney and Hypertension Center, PLC d/b/a Grand Forks Clinic,
The Medical Group, LLC,
North Dakota Dialysis, LLC,
Aurora Dialysis, LLC,
Kidney Institute of North Dakota, LLC,
KDJ Investment Group, LLC, and
KDJ Properties, LLC,

Debtors.[1]

**Jointly-Administered**

Case No.: 26-30886
Case No.: 26-30888
Case No.: 26-30889
Case No.: 26-30890
Case No.: 26-30891
Case No.: 26-30892
Case No.: 26-30893

Chapter 11 Cases

---

# MOTION FOR ORDER DETERMINING THE APPOINTMENT OF A PATIENT CARE OMBUDSMAN IS NOT NECESSARY

---

1. Debtors Kidney and Hypertension Center, PLC d/b/a Grand Forks Clinic ("Grand Forks Clinic"), The Medical Group, LLC ("Medical Group"), Aurora Dialysis, LLC ("Aurora Dialysis"), and Kidney Institute of North Dakota, LLC ("Kidney Institute" and, together with Grand Forks Clinic, Medical Group, and Aurora Dialysis, the "Debtors")[2] hereby file this Motion

---

[1] In accordance with Fed. R. Bankr. P. 2002(n) and 1005 and 11 U.S.C. § 342(c), as applicable, the Debtors' addresses and Employer Identification Numbers (EINs) are as follows: Kidney and Hypertension Center, PLC d/b/a Grand Forks Clinic (EIN #0821); The Medical Group, LLC (EIN #3765); North Dakota Dialysis, LLC (EIN #3768); Aurora Dialysis, LLC (EIN #8084); Kidney Institute of North Dakota, LLC (EIN #6471); and KDJ Investment Group, LLC (EIN #2199), each located at 5750 S Washington Street, Grand Forks, ND 58201. KDJ Properties, LLC (EIN #1920) is located at 645 Beacon Circle, Grand Forks, ND 58201.

[2] North Dakota Dialysis, LLC ("ND Dialysis"), KDJ Investment Group, LLC ("KDJ Investment"), and KDJ Properties, LLC ("KDJ Properties") are debtors in these jointly administered cases but are not "health care businesses" under 11 U.S.C. § 101(27A) and are therefore not subject to 11 U.S.C. § 333. None of them is "primarily engaged in offering to the general public facilities and services for—(i) the diagnosis or treatment of injury, deformity, or disease; and (ii) surgical, drug treatment, psychiatric, or obstetric care." 11 U.S.C. § 101(27A)(A). ND Dialysis owns 99.999% of each of Kidney Institute and Aurora Dialysis and does not otherwise

for Order Determining the Appointment of a Patient Care Ombudsman is Not Necessary (the "Motion").

2. In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

3. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Fed. R. Bankr. P. 5005. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The petitions commencing these Chapter 11 cases were filed on October 16, 2026 (the "Petition Date"). The cases are currently pending before this Court.

4. This Motion arises under sections 105(a) and 333 of title 11 of the United States Code (the "Bankruptcy Code"). This Motion is filed under Fed. R. Bankr. P. 2007.2, 9013, and 9014 and Local Rules 9013-1 and 9013-2. Notice of the hearing on this Motion is provided pursuant to Fed. R. Bankr. P. 2002 and the Notice and Service Requirements adopted pursuant to Local Rule 2002-1.

5. The Debtors request an order determining that the appointment of a patient care ombudsman is not necessary under the specific circumstances of these cases for the protection of the Debtors' patients. The grounds for this Motion are set forth below.

---

provide health care facilities or services as defined by 11 U.S.C. § 101(27A). KDJ Investment was formed to purchase and construct the Clinic Building (defined below), and KDJ Properties was formed to own Dr. Rabadi's primary residence. For these reasons, ND Dialysis, KDJ Investment, and KDJ Properties are not movants in this Motion, and references to the "Debtors" in this Motion do not include them.

## BACKGROUND

6. On the Petition Date, the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. There is presently no pending request or motion for the appointment of a trustee or examiner, and no official committee of unsecured creditors has been appointed.

### I. SERVICES PROVIDED BY THE DEBTORS TO THEIR PATIENTS.

7. Dr. Khaled Rabadi established Grand Forks Clinic in 2002. Grand Forks Clinic is a multi-specialty clinic located in Grand Forks, North Dakota. Grand Forks Clinic offers on-site imaging, including CT, MRI, mammography, X-ray, DEXA, ultrasound, and echocardiogram, and also maintains an on-site lab. Grand Forks Clinic operates from a building located at 5750 S Washington Street, Grand Forks, ND (the "Clinic Building").

8. In 2003, Kidney Institute was formed and now operates as a peritoneal dialysis facility in the Clinic Building.

9. In 2005, Dr. Khaled Rabadi formed the Medical Group, which currently operates from the Clinic Building. The Medical Group is a specialty clinic offering hormone replacement therapy and weight loss treatments.

10. In 2006, Aurora Dialysis was formed. It began operating a hemodialysis facility in 2008 at a separate location—1451 44th Avenue South, Suite 104D, Grand Forks, ND.

11. Collectively, the Debtors offer a comprehensive range of services, including primary care, internal medicine, gynecology and women's health, dermatology and esthetics, nephrology and dialysis, hypertension management, walk-in clinic, imaging (MRI, CT scan, mammography, ultrasound, echocardiogram, DEXA scan, and X-ray), lab services, weight loss, and bioidentical hormone replacement therapy.

## II. LICENSING AND SUPERVISION OF THE DEBTORS' SERVICES.

12. The Debtors are subject to several government regulators and professional medical societies that oversee clinical standards and practice guidelines. Aurora Dialysis and Kidney Institute are regulated by the North Dakota Department of Health ("ND Department of Health"), as well as the Centers for Medicare & Medicaid Services ("CMS"). Grand Forks Clinic and the Medical Group are regulated under the American College of Radiology, the Clinical Laboratory Improvement Amendments ("CLIA"), the City of Grand Forks Public Health Department ("GF Health Department"), and the ND Department of Health.

13. The Debtors are subject to routine inspections by the ND Department of Health, the GF Health Department, CMS, and CLIA. The ND Department of Health conducts unannounced surveys approximately every three years. As a part of that review, a compliance officer reviews the Debtors' files, consults with staff, and drafts a report. Additionally, if patients are present during the survey of the dialysis units, the ND Department of Health calls them at home to inquire regarding the quality of care. The GF Health Department conducts an inspection of the clinic every year. CLIA inspects the labs at Grand Forks Clinic every two years to ensure that strict quality control procedures, staff training, and competency and proficiency testing meet required standards and regulations.

14. The Debtors employ medical professionals who are separately licensed by professional regulators, which requires them to meet certain levels of care and medical competency to maintain their licenses. Across the Debtors' businesses there is one full-time physician, two physician assistants, one esthetician, three nurse practitioners, five registered nurses, three licensed practical nurses, one medical assistant, one social worker, one chiropractor, four imaging technologists, four lab technologists, and three dialysis technicians. The Debtors

also employ traveling medical professionals, which include one traveling dietitian, one traveling registered nurse, and two traveling dialysis technicians.

15. These medical professionals are licensed and regulated by the North Dakota Board of Medicine; North Dakota Board of Nursing; North Dakota State Board of Cosmetology; North Dakota State Board of Chiropractic Examiners; North Dakota Board of Dietetic Practice; North Dakota Board of Clinical Laboratory Practice; North Dakota Board of Social Work Examiners; and the North Dakota Medical Imaging and Radiation Therapy Board.

16. These licenses are not a one-time credential. Every one of the Debtors' licensed professionals must renew his or her license on a recurring annual or biennial schedule, and each renewal requires the professional to demonstrate continued compliance with the licensing board's standards, which often includes continuing education and practice requirements. Physician assistants, estheticians, chiropractors, and dietitians renew annually, while physicians, nurses, laboratory professionals, social workers, and imaging technologists renew every two years. As a result, the Debtors' professionals are subject to continuous, independent regulatory scrutiny of their competency and fitness to practice, which provides the patient protection a patient care ombudsman would otherwise be appointed to supply.

17. In their years in operation, none of the Debtors' full-time employees or traveling contractors has ever been the subject of an adverse finding or disciplinary action by any licensing board. On the rare occasions that a matter involving one of the Debtors' professionals has been referred to a licensing board for review, the board reviewed the matter and found no wrongdoing, confirming that the Debtors' professionals have consistently met the standards of care required by their licensing boards.

18. Likewise, no patient has ever filed a formal complaint against the Debtors. Nonetheless, the Debtors maintain an organized grievance procedure. An individual patient can file a complaint with any staff member. That complaint is then escalated, as necessary, to the supervisor, the business manager, Dr. Rabadi, and the appropriate professional licensing board.

## III. THE DEBTORS' TRAINING, PATIENT DISCLOSURES, AND INSURANCE PRACTICES.

19. When onboarding medical professionals and staff, the Debtors train each employee on the electronic records systems and on the Debtors' policies and procedures, which cover the requirements of the Health Insurance Portability and Accountability Act ("HIPAA"), patient rights, procedures to conduct lab tests and imaging validation, and the operation and workflow of the dialysis equipment.

20. The Debtors host annual training for staff, usually in January. These trainings are required for all employees, and the training covers HIPAA requirements, patient rights, procedures to conduct lab tests, and imaging validation.

21. The Debtors provide various agreements and disclosures to their patients, including the Patients' Bill of Rights, privacy disclosures, expectations of the patients, and a copy of the patients' intake paperwork.

22. The Debtors maintain general liability insurance for their practices. The Debtors' insurance provider is Medical Protective Company.

## IV. THE DEBTORS MAINTAIN THEIR PATIENT RECORDS.

23. To maintain their patient records, Grand Forks Clinic and the Medical Group use iSalus Healthcare ("iSalus"). iSalus has been operating for over twenty years. ISALUS, https://isalushealthcare.com/about/?_gl=1e8q0h7_upMQ.._gaNTk5MjczNjUuMTc5MzYzOTY2Mw.._ga_31GFLSTJKLczE3OTM2Mzk2NjMkbzEkZzEkdDE3OTM2Mzk3NjEkajYwJGwwJ

Ggw (last visited November 2, 2026). iSalus provides cloud-based software and billing services to thousands of physicians and healthcare systems across the United States. (*Id.*) Therefore, it is a well-established patient recordkeeping system.

24. Grand Forks Clinic also utilizes RamSoft for its imaging needs, including X-rays and MRIs. RamSoft has been operating for over thirty years and has a global presence providing thousands of physicians, radiologists, and medical clinics with a cloud-native PACS for imaging requirements. RAMSOFT, https://www.ramsoft.com/aboutus?hsLang=en (last visited November 2, 2026). Therefore, it is a well-established patient recordkeeping system.

25. At Aurora Dialysis,[3] Renvio is utilized for maintaining patient records. Renvio has been operating for over twenty-four years and is the market leader in providing patient recordkeeping for dialysis and kidney care. RENVIO, https://renvio.com/about-renvio/ (last visited November 2, 2026). Renvio is a purpose-built, cloud-based patient record system for dialysis, and it operates in over 1,000 clinics across the United States. *Id.* Therefore, it is a well-established patient recordkeeping system. Additionally, both Aurora Dialysis and Kidney Institute maintain physical copies of patient records on site in a locked room and locked filing cabinet.

26. At all times, the Debtors' patient records are secure. All electronic records are password protected and compliant with HIPAA and North Dakota state law.

## V. THE DEBTORS FILE FOR BANKRUPTCY, COMMENCING THESE CASES.

27. The Debtors' Chapter 11 filings followed several years of operational and financial pressure. In 2021, staffing departures following the implementation of federal healthcare-worker vaccination requirements significantly affected operations; it took approximately two years to rebuild staffing and restore operational stability. That September, as the Debtors opened a newly

[3] The Kidney Institute will also eventually be integrated into the Renvio cloud system.

constructed medical facility in Grand Forks, Sanford Health opened a competing clinic in the same market. Increased competition, inflation, rising personnel expenses, and the financial obligations associated with the new facility placed further pressure on the Debtors' operations.

28. The Debtors' liquidity was further strained in 2024 when the Change Healthcare cyberattack disrupted claims processing and delayed insurance reimbursements. Since that time, the Debtors had been operating for approximately three years without an available working-capital line of credit and relied primarily on patient collections. Although they sought additional financial support and accommodations from First Western Bank & Trust ("FWBT"), sufficient financing was not made available. The Debtors used merchant cash advances and private loans to maintain operations and patient care, but the repayment obligations added to their liquidity pressures. Their dialysis operations also experienced declining patient census and revenue, as well as recruitment and retention difficulties that required the use of more expensive traveling healthcare professionals.

29. The Debtors pursued operational improvements and attempted to resolve their financial difficulties outside bankruptcy, including through negotiations with FWBT, but the parties did not reach a mutually acceptable restructuring agreement. FWBT commenced foreclosure and collection actions against the Debtors and Dr. Rabadi individually. Against that backdrop, the Debtors commenced these Chapter 11 cases to preserve their assets and ongoing healthcare operations while seeking to negotiate with their lenders and develop a plan to repay creditors. The Debtors also identified continuity of patient care and protection of their employees' livelihoods as objectives of the filings.

30. The Debtors have no history or record of insufficient patient care.

## RELIEF REQUESTED

31. By this Motion, and pursuant to sections 105(a) and 333 of the Bankruptcy Code, the Debtors seek entry of an order substantially in the form filed with this Motion determining that the appointment of a patient care ombudsman is not necessary.

## BASIS FOR RELIEF

32. If a debtor that is a health care business files a petition for relief under the Bankruptcy Code, the Court is required to appoint a patient care ombudsman unless the Court finds that "the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case." 11 U.S.C. § 333(a)(1); *see also id.* § 101(27A). "An analysis under 11 U.S.C. § 333(a)(1) is necessarily a fact intensive one." *In re Flagship Franchises of Minn., LLC*, 484 B.R. 759, 762 (Bankr. D. Minn. 2013).

33. While the Bankruptcy Code is silent in terms of factors the court should consider, courts have developed a non-exclusive, nine-factor test to determine whether the appointment of a patient care ombudsman is necessary. Courts generally consider:

> (1) the cause of the bankruptcy; (2) the presence and role of licensing or supervising entities; (3) the debtor's past history of patient care; (4) the ability of the patients to protect their rights; (5) the level of dependency of the patients on the facility; (6) the likelihood of tension between the interests of the patients and the debtor; (7) the potential injury to the patients if the debtor drastically reduced its level of patient care; (8) the presence and sufficiency of internal safeguards to ensure the appropriate level of care; and (9) the impact of the cost of the ombudsman on the likelihood of a successful reorganization.

*Id.* No one factor is determinative, and the weight given to any factor is at the discretion of the court. *Id.* The court analyzes the totality of the circumstances. *Id.* at 766. Here, all of the above factors weigh against the appointment of a patient care ombudsman.

## I. CAUSE OF THE BANKRUPTCY.

34. The Debtors filed these bankruptcy cases because of financial and operational pressures, not because of any deficiency in patient care. Beginning in 2021, the Debtors lost several employees after federal COVID-19 vaccination requirements for healthcare facilities took effect, and rebuilding staffing took approximately two years. In the same year, the Debtors opened their newly constructed multi-specialty outpatient facility in Grand Forks at about the same time Sanford Health opened a competing clinic, which increased competition in a small market with limited population growth. That competition, together with inflation, rising personnel costs, and the obligations associated with the new facility, strained the Debtors' operations.

35. These pressures worsened in 2024, when the Change Healthcare cyberattack delayed claims processing and insurance reimbursements. Having operated for approximately three years without a working-capital line of credit, and unable to obtain sufficient financing from FWBT, the Debtors turned to merchant cash advances and private loans to keep operating and continue providing patient care, and the repayment obligations on that financing further reduced their liquidity. The Debtors' dialysis operations also faced a declining patient census and difficulty recruiting staff, which required the use of more expensive traveling professionals to keep life-sustaining treatments uninterrupted. The Debtors have since recruited local dialysis personnel. Throughout these challenges, the Debtors prioritized continuity of patient care, and none of the causes of these cases arose from the quality of care the Debtors provide.

## II. THE PRESENCE AND ROLE OF LICENSING OR SUPERVISING ENTITIES.

36. The Debtors are subject to substantial supervision by the relevant municipal, state, and federal regulators. For instance, the Debtors are regularly reviewed by CMS, the ND Department of Health, the GF Health Department, and CLIA. The Debtors also must comply (and do comply) with state and federal regulations, such as HIPAA. Aside from the Debtors' regulation

and certifications, the Debtors' staff must also be individually licensed and trained. Therefore, this factor weighs against the appointment of a patient care ombudsman.

## III. THE DEBTORS' PAST HISTORY OF PATIENT CARE.

37. The Debtors have a positive history of patient care and a strong relationship with their patients, underscoring the lack of need for the appointment of a patient care ombudsman. The Debtors have focused on providing the best quality of care for their patients, which has allowed them to care for approximately 20,000 patients over the course of their operations. In that time, the Debtors have never received a formal patient complaint, nor have their full-time employees or traveling contractors ever been the subject of an adverse finding or disciplinary action by any licensing board. No evidence of improper or inadequate care provided by the Debtors exists. Therefore, this factor weighs against the appointment of a patient care ombudsman.

## IV. THE ABILITY OF THE PATIENTS TO PROTECT THEIR RIGHTS.

38. The Debtors' patients are more than able to protect their rights without the appointment of a patient care ombudsman. The Debtors advise their patients of their rights prior to performing services. For example, the Debtors provide their patients with the Patients' Bill of Rights and privacy disclosures prior to providing care, each of which makes the patients aware of their rights related to the care provided and the actions they may take to enforce those rights. Patients only receive care for a few hours per appointment, thus reducing the risk of any issues for patients and the need for further oversight. Additionally, all patients have access to Dr. Rabadi twenty-four hours a day, seven days a week; they can reach out to Dr. Rabadi regarding any questions, problems, or issues at any time. Therefore, this factor weighs against the appointment of a patient care ombudsman.

## V. THE LEVEL OF DEPENDENCY OF THE PATIENTS ON THE FACILITY.

39. The Debtors' patients are not dependent on any facility of the Debtors. The patients do not stay overnight at any facility. Because of the nature of the Debtors' patients and their needs, they are dependent on the Debtors' services for only one to four hours a day while receiving care from the Debtors. Upon the filing of these cases, Dr. Rabadi contacted each dialysis patient individually by phone and by letter regarding the filings, and to assure them that their life-sustaining treatments would not be interrupted. Every dialysis patient was supportive and appreciative of the transparency. Furthermore, dialysis patients are not limited to only Aurora Dialysis and Kidney Institute to receive treatment in Grand Forks, ND. They can receive treatment from Altru Health for acute needs and Davita Dialysis for routine care. Therefore, this factor weighs against the appointment of a patient care ombudsman.

## VI. THE LIKELIHOOD OF TENSION BETWEEN THE INTERESTS OF THE PATIENTS AND THE DEBTORS.

40. The Debtors' interests align with those of their patients. The Debtors have an interest in providing high-quality care and the patients have an interest in obtaining such care. If the Debtors failed to provide high-quality care, the Debtors' certifications and licenses would be in jeopardy and the Debtors would lose patients and resulting revenue. Furthermore, as noted above, the dialysis patients were supportive and appreciative of the Debtors and their efforts to be transparent regarding the bankruptcy process. Therefore, this factor weighs against the appointment of a patient care ombudsman.

## VII. THE POTENTIAL INJURY TO PATIENTS IF THE DEBTORS REDUCE THEIR LEVEL OF SERVICE.

41. The Debtors currently have no plans to reduce their level of service to their patients. If the Debtors were to reduce their level of service, there would be an impact on the patients, but they would not suffer substantial injury. The Debtors are not a long-term care facility, nor do they

offer any inpatient services. Moreover, if the Debtors were to reduce their level of service, the Debtors may refer their patients to other providers. *See, e.g.*, *In re Aknouk*, 648 B.R. 755, 765 (Bankr. S.D.N.Y. 2023) ("If the level of Debtor's patient care became drastically reduced, it could certainly be harmful to patients, but patients could find another dentist to frequent without the attendant disruption that occurs when one is moved from one inpatient setting to another."). Therefore, this factor weighs against the appointment of a patient care ombudsman.

## VIII. THE PRESENCE AND SUFFICIENCY OF INTERNAL SAFEGUARDS.

42. The Debtors maintain substantial internal safeguards related to patient care. The Debtors' staff are individually licensed and trained. The Debtors require their staff to complete additional annual training, including training related to patient privacy and HIPAA compliance. Further, the Debtors' records and systems are all password protected and HIPAA compliant. The Debtors also carry insurance, which the Debtors will maintain throughout these bankruptcy cases. Therefore, this factor weighs against the appointment of a patient care ombudsman.

## IX. THE IMPACT OF THE COST OF THE OMBUDSMAN ON THE DEBTORS' REORGANIZATION.

43. In contrast to the limited need for a patient care ombudsman, the appointment of a patient care ombudsman would have a substantial impact on the Debtors' reorganization. Pursuant to 11 U.S.C. § 333(b), an ombudsman would be required to interview the Debtors' patients and staff, monitor patient care on an ongoing basis, and report to the court periodically. *See generally id.* (describing the duties of a patient care ombudsman). Each of these actions would require time and money to complete all while the current safeguards maintained by the Debtors are continued. In addition to being a significant expense for the Debtors, the presence of an ombudsman may cause the Debtors' patients and staff unnecessary stress and concern due to the presence of an unknown person in the workplace and/or during treatment of sensitive medical issues. *See, e.g.*,

*Flagship Franchises*, 484 B.R. at 765–66 ("Many courts have weighed the cost heavily when deciding whether or not to appoint an ombudsman."). Therefore, this factor weighs against the appointment of a patient care ombudsman.

## CONCLUSION

44. For the foregoing reasons, the Debtors respectfully request that the Court grant the relief requested in the Motion.

45. This Motion is accompanied by a proposed order and proof of service.

46. Pursuant to Fed. R. Bankr. P. 9006(d), this Motion is supported by the verification of facts in the Declaration of Khaled Rabadi attached hereto.

47. Pursuant to Local Rule 9014-1(B), the Debtors hereby give notice that they may, if necessary, call Khaled Rabadi, the owner of the Debtors, whose business address is 645 Beacon Circle, Grand Forks, ND 58201, to testify regarding the facts set forth in the Motion.

48. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

**WHEREFORE**, the Debtors respectfully request that this Court enter an order:

A. Granting the Motion;

B. Determining that the appointment of a patient care ombudsman is not necessary under the circumstances of this case for the protection of the Debtors' patients; and

C. Granting such other and further relief as the Court deems proper.

Dated: November 2, 2026

*/e/ Steven R. Kinsella*

Steven R. Kinsella (#09514)
skinsella@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500
Minneapolis, MN 55402-4400

612.492.7000

Austin A. Eggl (#09672)
**FREDRIKSON & BYRON, P.A.**
51 Broadway, Suite 400
Fargo, ND 58102-4991
(701) 237-8200
aeggl@fredlaw.com

**ATTORNEYS FOR DEBTORS**

I, Khaled Rabadi, declare under penalty of perjury that the facts set forth in the preceding Motion for Order Determining the Appointment of a Patient Care Ombudsman is Not Necessary are true and correct, according to the best of my knowledge, information, and belief.

Dated: November 5, 2026

Signed: DocuSigned by: Khaled Rabadi
56D59FC25E1A448...
Khaled Rabadi

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

---

In re:

Kidney and Hypertension Center, PLC d/b/a Grand Forks Clinic, — Case No.: 26-30886
The Medical Group, LLC, — Case No.: 26-30888
North Dakota Dialysis, LLC, — Case No.: 26-30889
Aurora Dialysis, LLC, — Case No.: 26-30890
Kidney Institute of North Dakota, LLC, — Case No.: 26-30891
KDJ Investment Group, LLC, and — Case No.: 26-30892
KDJ Properties, LLC, — Case No.: 26-30893

Chapter 11 Cases

Debtors.

---

**ORDER GRANTING MOTION DETERMINING THAT THE APPOINTMENT OF A PATIENT CARE OMBUDSMAN IS NOT NECESSARY**

---

Debtors Kidney and Hypertension Center, PLC d/b/a Grand Forks Clinic ("Grand Forks Clinic"), The Medical Group, LLC ("Medical Group"), Aurora Dialysis, LLC ("Aurora Dialysis"), and Kidney Institute of North Dakota, LLC ("Kidney Institute" and, together with Grand Forks Clinic, Medical Group, and Aurora Dialysis, the "Debtors") filed a Motion for Order Determining the Appointment of a Patient Care Ombudsman is Not Necessary (the "Motion"). Based on the record, the Court finds that grounds exist to grant the relief requested in the Motion.

**THEREFORE, IT IS ORDERED:**

1. The Motion is **GRANTED.**

2. The appointment of a patient care ombudsman is not necessary under the specific circumstances of this case for the protection of the Debtors' patients.

Dated:

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

---

| | |
|---|---|
| In re: | **Jointly-Administered** |
| Kidney and Hypertension Center, PLC d/b/a Grand Forks Clinic; | Case No.: 26-30886 |
| The Medical Group, LLC; | Case No.: 26-30888 |
| North Dakota Dialysis, LLC; | Case No.: 26-30889 |
| Aurora Dialysis, LLC; | Case No.: 26-30890 |
| Kidney Institute of North Dakota, LLC; | Case No.: 26-30891 |
| KDJ Investment Group, LLC; | Case No.: 26-30892 |
| KDJ Properties, LLC, | Case No.: 26-30893 |
| | Chapter 11 Cases |
| Debtors. | |

---

**NOTICE OF MOTION FOR ORDER DETERMINING THAT APPOINTMENT OF A PATIENT CARE OMBUDSMAN IS NOT NECESSARY**

---

**NOTICE IS HEREBY GIVEN** that Kidney and Hypertension Center, PLC d/b/a Grand Forks Clinic ("Grand Forks Clinic"), The Medical Group, LLC ("Medical Group"), Aurora Dialysis, LLC ("Aurora Dialysis"), and Kidney Institute of North Dakota, LLC ("Kidney Institute" and, together with Grand Forks Clinic, Medical Group, and Aurora Dialysis, the "Debtors") have filed a Motion for Order Determining That Appointment of a Patient Care Ombudsman Is Not Necessary. A copy of the Motion is attached and served upon you.

**NOTICE IS FURTHER GIVEN** that written objections to said Motion, if any, shall be filed with the Clerk of the US Bankruptcy Court, Quentin N. Burdick Courthouse, 655 1st Avenue North, Suite 202, Fargo, North Dakota 58102-4932 within 14 days from the date of the filing of this notice. Any objections not filed and served may be deemed waived.

Dated: November 6, 2026

*/e/ Steven R. Kinsella*

Steven R. Kinsella (#09514)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
(612) 492-7000
skinsella@fredlaw.com

Austin A. Eggl (#09672)
**FREDRIKSON & BYRON, P.A.**
51 Broadway, Suite 400
Fargo, ND 58102-4991
(701) 237-8200
aeggl@fredlaw.com

**ATTORNEYS FOR DEBTORS**